CARTA-BACK, INC., *et al.*, Plaintiffs-Appellees, *v.* ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 76-518

Opinion filed September 6, 1978.

William J. Scott, Attorney General, of Chicago (Hercules F. Bolos and Mary C. Ubatuba, Assistant Attorneys General, of counsel), for appellant Illinois Commerce Commission.

Eugene L. Cohn and Bernard G. Colby, both of Chicago, for other appellants.

James R. Madler and Daniel R. Fusco, both of Chicago, for appellees.

Mr. JUSTICE SIMON delivered the opinion of the court:

Carta-Back, Inc. (Carta-Back), a common carrier trucking firm, was issued a certificate of public convenience and necessity by the Illinois Commerce Commission (the Commission) on February 21, 1963, and a certificate of registration by the Interstate Commerce Commission on October 20, 1964. After incurring substantial operating losses during 1965, 1966 and 1967, in December 1967 Carta-Back assigned its assets, including the certificates, to Leonard M. Spira for the benefit of creditors. In liquidating these assets to satisfy claims of Carta-Back's creditors, Spira sold the certificates to Illinois Industrial Transportation, Inc. (the Transferee). On July 23, 1968, pursuant to section 18—309(c) of the Illinois Motor Carrier of Property Law (the Law) (Ill. Rev. Stat. 1975, ch. 95½, par. 18—309(c)), Carta-Back, by Spira, and the Transferee filed a joint application seeking the transfer of Carta-Back's Illinois authority to the Transferee. Neither Carta-Back nor Spira conducted any operations after the assignment of the certificates to Spira.

Hearings on the application commenced in September 1968, and continued until March 1969. In an order filed October 21, 1970, the Commission denied the application for transfer. An application for rehearing was filed and granted by the Commission. Hearings took place in 1971. On August 14, 1974, the Commission entered an order reaffirming the prior denial order.

Carta-Back filed a second application for rehearing, alleging that the Commission erred by failing to address the statutory criteria set forth in section 18—309(c). This application was denied on October 16, 1974, and Carta-Back appealed this denial of a rehearing to the circuit court, placing the propriety of the August 14, 1974, order before that court. The circuit court held the order defective on the grounds it ignored the statutory criteria of section 18—309(c) and was against the manifest weight of evidence, and reversed and remanded the Commission's order. It directed the Commission to enter an order to the effect that the manifest weight of the evidence and Illinois law require a finding that the statutory criteria for a transfer had been satisfied. The Commission has appealed this order of the circuit court.

The issues which the Commission must consider in a transfer application hearing are set forth in section 18—309(c):

> "If the Commission finds that (1) the proposed purchaser or lessee is fit, willing and able, (2) *that the proposed seller or lessor has not abandoned, suspended, or discontinued operations*, and (3) that the transaction proposed will be consistent with the public interest

and the policy declared in this Chapter and that the conditions of this Section have been or will be fulfilled, it shall enter an order approving and authorizing such transfer * * * upon such terms and conditions as it finds to be just and reasonable." (Emphasis added.)

Thus, to deny a transfer the Commission needed to determine only that one of these three required findings was not established by the evidence.

■■ We are confronted with an order which contains several unintegrated conclusory findings. It makes no determination as to the fitness of the Transferee or the public policy declared in the chapter. (Ill. Rev. Stat. 1973, ch. 95½, par. 18—101.) Although not clearly stated, the order indicates that the Commission denied the transfer because it believed Carta-Back had abandoned, suspended or discontinued operations. The evidence which supports this finding must be divided into two separate and relevant time periods: (1) Carta-Back's operations prior to the assignment to Spira and (2) the period subsequent to the assignment. Our conclusion is that the finding of abandonment is supported by the evidence as to the subsequent period which clearly establishes that no operations were conducted after the assignment, even though it is against the manifest weight of the evidence with respect to the period prior to the assignment. Nevertheless, because the Commission's order was primarily concerned with the nature of Carta-Back's operations up to December 1967 when the assignment took place, this opinion will review the evidence covering both periods in order to clarify the Commission's action.

The Commission's denial of the transfer is based in part on the time period subsequent to the assignment of the certificate to Spira. The Commission states in finding 9 of the October 1970 order:

"[T]hat the evidence showed operations were discontinued on the 26th day of December, 1967, and the authority has been dormant since that time."

This clearly indicates that the Commission found Carta-Back had abandoned, suspended or discontinued operations when the assignment was made. This finding was incorporated into the 1974 order by finding 10 of that order which adopted all the findings of fact in the 1970 order for purposes of the 1974 order.

It is undisputed that no trucking operations were conducted after December 26, 1967. The certificate was sold to the Transferee on January 25, 1968, but the transfer application was not filed until July 23, 1968. This application is similar to the one considered in *Hamilton v. Illinois Commerce Com.* (1970), 47 Ill. 2d 264, 265 N.E.2d 156, where the operations of the original licensee ceased upon his death. Six months after

the death, the licensee's widow had the authority placed in her name. Then, 10 months after the death, the widow filed an application to transfer the authority. As in the present case, no activity was carried on under the certificate during the period prior to the filing of the transfer application. The court held that the widow's failure to conduct any business after her husband's death justified denying the transfer. The court concluded that the "order was not against the manifest weight of the evidence because there was no proof of continued operation."

Carta-Back contends *Hamilton* is not applicable to its situation, explaining the 7-month hiatus before the filing of the transfer application in the following manner. It had filed a transfer application on January 26, 1968, the day after the certificate was sold. However, the Commission immediately returned this application to Carta-Back because Carta-Back's certificate of authority had been revoked on November 8, 1967, for failure to pay required franchise fees. Carta-Back filed a petition to reinstate its certificate, and that petition remained pending from February 1, 1968, until July 17, 1968, when the Commission reinstated Carta-Back's authority upon payment of the proper fees. The transfer application was refiled within a week. Carta-Back argues that the need to reinstate its certificate before presenting a transfer application excuses the absence of continued operations in the period after the assignment to Spira, and distinguishes *Hamilton* where there was no activity for 10 months. We do not agree.

■■ According to Carta-Back's own explanation, the 7-month delay in filing the transfer application after the undisputed discontinuance of operations on December 26, 1967, is attributable to its failure to keep its operating authority current by paying required franchise fees. The failure to pay required fees cannot be used to excuse the period of inactivity which followed the assignment to Spira. Carta-Back was at fault in neglecting to pay proper fees and it should not be permitted to rely on its own fault to excuse the delay in filing a transfer application with the attendant absence of trucking operations. We, therefore, are unwilling to hold that the absence of operations during the period between December 27, 1967, and the filing of the transfer application on July 23, 1968, did not amount to an abandonment, suspension or discontinuance of operations as contemplated by section 18—309(c).

This does not mean that licensees who are forced to cease operations abruptly due to circumstances such as death or bankruptcy will have their certificates rendered unmarketable because of inactivity while the transfer application is pending. However, these licensees must still act promptly to sell and to apply to transfer their authority. The delay and attendant abandonment of business operations was the fault of Carta-Back and therefore the Commission acted properly in denying the

transfer because of the absence of operations for a period of more than 6 months after the assignment to Spira.

With respect to the period prior to the assignment to Spira, the Commission concludes in finding number 8 of the 1974 order that Carta-Back had "failed to show that it was capable of and actually engaged in control and direction of a transportation service as a common carrier * * *." This conclusion is in turn based on specific evidentiary findings which deal with Carta-Back's role as lessee of the equipment and personnel it used in carrying freight; these evidentiary findings were to the effect that the lessors of this equipment directly controlled and supervised certain aspects of Carta-Back's operations. The Commission found:

> "[T]hat the evidence fails to show that Transferor was actually engaged in a motor carrier service inasmuch as it did not appear to have exercised *direct and complete* control of the movement and handling of freight and the persons engaged therein to the extent that Transferor had immediate and direct control over safety, hours of service of employees and other matters pertaining to safe, adequate and efficient service." (Emphasis added.)

We interpret this to mean that the Commission believed that because Carta-Back did not have complete, direct control of the trucking operation, it had abandoned, suspended or discontinued its operations prior to December 1967, and so was not entitled to transfer its authority.

● 3 It is correct that licensed carriers who permit other parties to provide a given service have in fact abandoned, suspended or discontinued operations. However, the relevant case law indicates that the Commission's conclusion—that Carta-Back was not the party providing the service to the public—is contrary to the manifest weight of the evidence. The United States Supreme Court, the Illinois Supreme Court and the Interstate Commerce Commission have all held that carriers which use the equipment and employees of other parties and which cede some control over their operations to these parties may still be regarded as the carriers providing the service to the public. *United States v. Drum* (1962), 368 U.S. 370, 7 L. Ed. 2d 360, 82 S. Ct. 408; *Be-Mac Transport Co. v. Illinois Commerce Com.* (1967), 38 Ill. 2d 154, 160, 230 N.E.2d 216; *Investigation & Revocation of Certificate* (1967), 106 M.C.C. 61.

These three decisions demonstrate that the test to determine whether a carrier is providing service to the public depends on whether that carrier has assumed in significant measure the characteristic burdens of a transportation business. This test involves an examination of the entire structure of the operations and a determination seldom can rest upon one factor alone. While the degree of direct control a carrier exercises over

day-to-day operations is one factor, it is not the sole factor; and even though a carrier has ceded some control over its operations, it has not necessarily yielded overall control of these operations. An important consideration is the degree to which a party has assumed the financial risks of the operations.

Based upon this standard, the Commission erred in denying the transfer on the basis that Carta-Back was not the party providing the service to the public prior to the assignment to Spira in December 1967. It is true that some control over the operations was ceded to the lessors of the equipment Carta-Back used. These lessors hired and fired drivers, compensated the drivers, assigned drivers to the vehicles, and furnished and maintained the vehicles. Yet, the evidence establishes that Carta-Back had sufficiently assumed the burden of the transportation business to be considered the party providing the service to the public. Consequently, Carta-Back had not abandoned its operation.

First, the evidence before the Commission demonstrates that only Carta-Back assumed the financial risks of the operations. Carta-Back suffered the entire loss for any unpaid bill, and the equipment-lessors' charge to Carta-Back was not related to the collection or nonpayment of Carta-Back's receivables. Carta-Back decided which tariff rates to file with the Commission, and Carta-Back computed freight charges from these tariffs. Freight bills were prepared and mailed by Carta-Back, and Carta-Back was responsible for collection of these charges. The leasing was done on a short-term basis so that Carta-Back was not protected from even short-term cost rises. Payment was on an hourly basis and the rate of payment reflected all possible upward variations in cost, such as overtime pay or higher wages due to differences in tonnage and equipment. Nothing in the record indicates that the lessors' compensation was contingent upon the overall success of Carta-Back's business. In addition, Carta-Back investigated claims for lost or short freight; the acceptance or rejection of those claims was its decision. The claims it decided to honor were referred to its insurance carrier. Further, Carta-Back held itself out to the general public as responsible for the operations by attaching signs with Carta-Back's name and address to the leased vehicles. Thus, Carta-Back assumed not only the risk of loss, but also the incidental costs of the operations.

Second, Carta-Back was seeking business and trying to profit from its status as a licensed carrier. Carta-Back, not the lessors, advertised its services and solicited customers throughout Illinois. Five hundred letters soliciting business were mailed by Carta-Back to companies listed in the Illinois Manufacturers Guide, and a sales follow-up program was maintained with companies which responded to the letters. Carta-Back

employed freight solicitors in Chicago Heights and Kankakee to procure business, and Carta-Back's general manager maintained personal and direct contacts with 20 to 25 shippers.

Third, the evidence also shows that Carta-Back controlled these operations, even though it did not own the trucks which hauled freight or directly employ the drivers and dockmen who handled the freight. The leased trucks were inspected by Carta-Back for safety and appearance, and the leased trucks carried only Carta-Back's freight. Carta-Back controlled what equipment would be dispatched for a given load, reviewed the drivers' qualifications, and had the final say over the use of any driver. Also, copies of Carta-Back's operating authority were attached to the inside of the truck cabs. The drivers were made aware of this authority, and were instructed to call Carta-Back to report accidents or other unusual occurrences. Carta-Back established the starting and quitting times of drivers and dockmen, and decided when overtime was necessary. The dockmen performed loading and unloading pursuant to instructions provided by Carta-Back, and trip sheets were prepared by Carta-Back. In short, Carta-Back could and did dictate the conduct of the operations.

It was Carta-Back which assumed the financial risks, sought business and profit, and ultimately controlled the operations. Thus the Commission's finding that Carta-Back was not the party providing the service and therefore had abandoned its operations prior to the assignment to Spira was against the manifest weight of the evidence.

Nevertheless, in view of the abandonment of operations after the assignment, the Commission's conclusion was correct and its order denying the transfer application is valid.

Consequently the order of the circuit court of Cook County must be reversed.

Judgment reversed.

McNAMARA and McGILLICUDDY, JJ., concur.